DARDEN *v.* THE STATE.

No. 7785.  OCTOBER 16, 1930.  FEBRUARY 13, 1931.

*Whitaker & Whitaker*, M. B. *Eubanks*, and *John A. Darden*, for plaintiff in error.

*George M. Napier*, attorney-general, *John C. Mitchell*, solicitor-general, and *T. R. Gress*, assistant attorney-general, contra.

HILL, J.  Moses Darden, Marcellus Darden, and Steve Darden were indicted for the offense of murder.  The indictment charged that they murdered Chesley Davis by shooting him with a shotgun. Marcellus Darden was put upon trial; and the jury, after hearing the evidence and the charge of the court, returned a verdict of guilty, with a recommendation to the mercy of the court; and he was accordingly sentenced to the penitentiary for life.  He made a motion for new trial, which was overruled, and he excepted. The evidence is very voluminous, and we set out only enough thereof to show that the jury were authorized to convict the de-defendant.

L. V. Adcock, for the State, testified:  "I live about four miles northwest of Kingston.  On Tuesday morning, the 22d of April, or maybe it was the 23d, I was driving along the road leading from my house out to the Dixie highway; that road is the one that goes by D. Wilbanks' house.  When I came along that road the sun was something like an hour high.  I discovered an automobile standing on that road.  There was a man in it.  He was dead.  He was sitting up under the steering-wheel, with his right hand on the steering-wheel and his left hand hanging down to his side.  In leaving Kingston you go out to the highway over the overhead bridge, and then you take the right-hand road.  That is a side road.  It goes beyond Barnsley's.  I think that car was standing nearly a mile from the Dixie highway.  It was pointed

towards Kingston. I was in a wagon, going up towards Kingston. I was driving a young pair of mules, and they got scared as I started around the car, and I was trying to hold my team and trying to keep out of the way of the car too. The road was narrow at that point. There was room by the car for me to pass on the left side of that car. I stopped after I passed it. Somewhere between five or half past six o'clock a. m. probably. So far as I know, nobody else had discovered that body at that time. After I discovered it I came on down to Mr. Wilbanks. That is D. Wilbanks' grandfather. From the car to the old gentleman's house I would guess it was something like two hundred yards, probably farther. I reported to Mr. Wilbanks what I had seen, and we went back up there. When I went back was when I discovered his right hand on the steering-wheel and his left hand dropped down. . I was close when I went back; more than I had been before. We did not disturb anything in the car. We moved nothing. After I went back with Mr. Wilbanks I went on to Kingston. I notified them there of finding the dead body. I don't know if they called the law after I got there, or before. It was after, I suppose. I noticed the wounds of this dead man. I saw one. It was up in his neck there [indicating]. On the left of the neck. I noticed a five-gallon jug, and looked like between the two seats a jug in a sack, and a double-barrel shotgun in the car. The shotgun was in the rear seat. I think it was lying partly on the jug there. Like this is the seat and here is the back, this gun was lying between the jug and the back of the seat. I did not take the gun out, nor did anybody while I was there. I did not see anything in the dead man's hands. He was on the front seat, and the shotgun was on the back seat. That was in this county. I later learned that the dead man was Chesley Davis. That was in April of this year."

Ed Wilbanks, for the State, testified: "My name is Ed Wilbanks. I am seventeen. I live at the same place now that I did when Chesley Davis was killed. I live about two miles and a half south of Kingston. To go to my house you go to Kingston and go right out the highway, go over the overhead bridge and on down the highway, and the first road to the right you take that road, and that leads right on out to my house. That road by my house leads right on to the Barnsley's schoolhouse. On the afternoon

of Monday, April 22d, I was at home—at home on that morning; I was in Kingston that afternoon. I knew Chesley Davis in his lifetime. On this Monday in question I saw Chesley Davis. In Kingston, about four o'clock, I got in the car with him and went out to Charlie Ledford's. He wanted me to go out there with him. To go to Charlie Ledford's, you go right up the railroad towards Adairsville till you get there to the Hawkins place, and you turn to the left and go back through the woods, right beyond the old cement plant, and turn to the left. From Kingston to Charlie Ledford's house is about two and a half or three miles. We went on to his house. Charlie wasn't at home. We turned around and went back to Kingston. We stayed around there until we met Charlie. We met Charlie up there in the highway; then he got in the car with us, and we went back down to Mr. Rampley's store, and then back out to Charlie's house. Up at Charlie Ledford's house, Charlie and Mr. Davis got out and went down to the barn. I do not know what Davis's business up there with Charlie Ledford; he didn't tell me. On the second trip up there we were all riding in Davis's car. Mr. Davis and Charlie got out and went down to the barn, and after a while they come back to the car with something in a sack, and put it in the back end of the car. I heard talk up there about trading a pistol. Charlie had a sawed-off shotgun that he said he would trade for a pistol. That talk was down there at Mr. Ledford's barn, or right at the barn. Charlie wanted to trade him the shotgun for his pistol. That was Charlie that was talking, about trading him that sawed-off shotgun for his pistol. They did not trade. A jug was put in the car. The jug was in a sack. It was put in the back of the car. Well, after they didn't trade guns, me and Mr. Davis turned around and went back to my house. Before we went up to Charlie Ledford's house Davis appeared to be drinking. You could just smell liquor on his breath. I did not notice it in any way in his actions. After he left Charlie Ledford's house or barn, you could tell he had a little more. Smelled like he had been drinking a right smart. Davis drove the car away from there. Then we went back to my house. On the way up there, I told him I had a double-barrel hammerless gun that I would trade for his pistol. It was after sundown when we left Ledford's. And after we left from Charlie Ledford's we went

back to Kingston and out to my house. From Ledford's to my house, that way, it is about five to five and a half miles. There is a road from my house to Ledford's through the field. If you traveled that road I couldn't hardly tell you how far it is. It is a shorter way. It is so rough you can't get over it all the way in a car. I stopped out there in the road, and I went in the house and back down the hill. When we went to my house we left the car sitting on the hill; from my house to Kingston you have to come up a hill, and then go straight and ride down another hill. We went up there, and he stopped in front of my house. We turned around there. Then I went in the house and stole out the shotgun. It was dark then. When I got back Davis was sitting in his car, out towards the front of my house. When he turned around he moved down a little. I slipped my shotgun out of my house. When I went back to Davis I got in the car, and then we went on down to the next hill. That put us at the top of the second hill. We were standing there and talking; he was sitting in the car, and I was standing by the side of it. Then Mr. Mose, Marcellus and Steve Darden came up. They come from towards Kingston, they were traveling in a Ford coupé. Mose was driving the car then. They didn't get out, not right then. When they rolled up they spoke to me, and I spoke to them and said 'hello.' While me and Davis were sitting by the car, before they come up, we were talking about trading a gun. We did not trade then.

"When they came up, I laid my shotgun on the bank of the road. I went up there where they was at, and Mr. Steve asked me if I had any liquor. Steve had not gotten out then. When they drove up, they pulled by us just a little ways. I told him I had some liquor. I asked him how much he wanted, and he said he wanted a quart, and if I didn't have it he didn't want nothing, and he didn't have nothing to put it in, but I told him I would get him that; and Mr. Mose said that he didn't want no scant; so I went back to the car, and we was talking, and Mr. Steve had done got out and come up there where we was, and Mr. Chesley Davis drawed his gun on Mr. Steve. Yes, and told him, says, 'Stick 'em up.' It was a pistol, and he said, 'Stick 'em up.' I told him, I says, 'Now, we don't want to have any trouble,' and he taken his gun and stuck it back down under his belt. Then I got on the side of the car with Mr. Mose and Mr. Marcellus, and

Steve stayed there with Mr. Davis. I rode on the side of their car down to my house, and Mr. Steve stayed there with Mr. Davis and his car with him. I went up there and stole a fruit-jar out of the smokehouse. While I went up to the smokehouse the Dardens stayed out there in the road at the house. When I stole out the fruit-jar I went down to the car and rode down to the foot of the first hill and got them a quart of liquor. When I left Steve Darden and Chesley Davis at the foot of the first hill and was going back with the other Dardens to my house, I did not notice any signs of hard feeling between them, not right then I didn't. When we were gone we left Steve Darden and Chesley Davis there. When we come back we didn't go just where they were at. We stopped back behind our car. I had my liquor hid over there in the field in a ditch. The Dardens had a Ford coupé. When we rode up there to my house and back again, they were both in the car. I was on the fender, standing on the side. It was the side the driver was on when we was going, but coming back I was standing on the other side. I saw inside of that car. I did not see any sign of a shotgun in that car or a gun of any sort. Then, when we got back we didn't go back where Steve and Davis were at. We stopped back of where we were when I went to get them the liquor. The liquor was off the road just a little ways. I had it hid out there somewheres. Well, I come on out where they were at, and they took the liquor and paid me for it, and Mr. Mose was holding to the door of the car and throwing up. When I went back to get the liquor I went by myself, and when I got back Mose was standing by the door of his car. They got back in the car after they paid me for the liquor. They paid $2.25 for the liquor. Mr. Mose paid me. They got back in the car, and I got back on the side of it, and they went on back out where Mr. Steve and Davis was at, and Steve got in the car with Mose and Marcellus, and me and Mr. Davis got in our car, and before Mr. Steve got in his car he said he didn't like the way Mr. Davis done. He had reference to throwing the gun on him. They left then and went on back towards Kingston. Mose was driving when they left. I couldn't say exactly what time it was then, I don't really know. Well, my guess is, it was along about eight o'clock, somewhere along there. When they left they were about two and a half miles from Kingston. They drove off

in that direction after they left. I got my shotgun, and Mr. Davis asked me how I would like to trade, and if I would give him my shotgun for his pistol and I told him, 'I will give you my shotgun for the pistol and three dollars I owe you.' I gave him the shotgun for the pistol and canceled a three-dollar debt I owed him for liquor. And we traded. We was in the same place where that was, out where they came out there. The shotgun was not loaded. I didn't have no shells for it, but he told me if we traded that I would have to get him two shells for the gun of my uncle. My uncle lives down there, the second house from the road. My uncle is Ace Pike. He lives with my grandfather, old man Wilbank's father. Well, I got in the car with him, and we started on down there to get the shells, and we got down there to the foot of the first hill and run in a ditch and got out of the ditch. He just · drove out of the ditch. He seemed to be drunk then. We started on up the road, and we got over there at the negro schoolhouse, and he killed his motor and I got out and cranked it, and he went on up the hill from the schoolhouse, the first hill you go up after you pass the negro schoolhouse, and he killed the motor again and rolled back in the ditch; killed his motor and rolled back in the ditch on the left of the road.

"While we were standing there the Dardens came up there in their Ford, coming from towards Kingston. His car had been killed, the motor; and the car had rolled back in the ditch from towards Kingston, that way [indicating]. They were running when I first saw them, and his car was back like it was going towards Kingston; his car rolled back toward the bank. They stopped on their right, which was Davis's left of the road. When they stopped, from the front of Davis's car to the front of their car it was almost even, a very little distance between them. After we traded I took the pistol and put it in my pocket and put the shotgun on the back. The pistol was loaded. You interrupted me where their car had rolled up and stopped. I got out and went up there, and Mr. Marcellus Darden told me I had better get away from there, and I told him that I couldn't, and Mr. Davis cranked up and rolled up by the side of them, and Mr. Mose he got out of the car with his gun, and Mr. Marcellus told me I had better get him away, and Mr. Davis says, 'What in the hell are you all doing here?' and I saw Mr. Mose was going to shoot, and I

says, 'Please don't shoot,' and I turned and started to run, and Mr. Mose shot, and I went home, and early next morning —At the time when Davis rolled up and stopped he went to the right of the Darden car. They were almost even. He got out on the right-hand side, the way they were going, got out on Davis's left, the driver's side; when he stepped out he just stepped right out of the car and went to the back of his car and throwed his gun right across that back end of his car. I mean that flat-like place on the back of a Ford coupé. Yes, sir, and that is the only place he went. With reference to the right-hand back wheel of his car, he was right there, and he shot at Davis across the back end of the coupé. Yes, sir, Mr. Marcellus Darden was driving the Darden car at that time. Marcellus or Steve neither of them got out. I had the pistol at that time. Davis was shot. He was just sitting in his car. The last I noticed he had his hand on the steering-wheel. He didn't kill his motor, not at any time. I ran just an instant before I heard the shot. I ran home. When I got there I went on in the house and went to bed. I hid the pistol in the smokehouse before I went in the house. Up on the piece of wood you nail the plank to. I don't know what you call it. I sometime later told Mr. Gaddis where that pistol was. [Pistol handed to witness] That is the pistol that I got from Davis and hid in the smokehouse that night. [Shotgun handed to witness] That is the gun I traded him, the shotgun. Davis had on an overcoat and a lumber jacket. Moses shot him with a shotgun. I did not go back there that night. Next morning I went to Kingston; they had found Davis's body when I got there. There wasn't nobody when I went back there the next morning but Ace Pike and me and Webb Findley; we went on back. I don't know if Mr. Adcock had done found his body. Then we went on to Kingston to tell Mr. Arnold and them, and I didn't know Mr. Adcock had found them. When Mr. Arnold got out there the next morning, that car was in the same position as he was when I last saw him, only his head was kinder fell over a little bit. His head was lying over to the right. He was shot in the neck, on the left side. I did not hear the Dardens pass my house that night after the shooting; the road is right at the yard right at the house. I run all the way home, mighty nigh it. If they had passed my house fifteen or twenty minutes after the shooting I

could have heard them, I would have heard them. I did not hear them. I said Marcellus was driving the car when they came back from Kingston. From the time that they left the first time, after they got the whisky and headed towards Kingston until they came back from the direction of Kingston, it seemed to me like thirty minutes or an hour. It seemed like thirty minutes or an hour before they got back. I mean they left the first time when they come out there and got the liquor. Along about eight o'clock I think it was; they were some thirty minutes to an hour. I would have to be guessing at it, because I never paid no attention to what time it was when they came back. It was not more than an hour, and not less than a half. At the time of this shooting we had not got to Ace Pike's where we were to get the shotgun shells. From where I live to Ace Pike's or my grandfather's (they live together) is about three quarters of a mile. Ace. Pike's house was the closest to the scene of the shooting from my father's house. It was hardly a quarter of a mile down to Ace Pike's. It is about a half mile from the scene of the shooting, from where Davis was killed, back to my father's house, I would say. I do not know which way the Dardens went when they left there. They were still there when I ran. I didn't hear them or see them leave there. That was in this county, where the killing occurred."

B. F. Craddock, for the State, testified: "I live at Kingston. Moses Darden is my son-in-law, married my daughter. I remember the occasion, the day that Mr. Davis was said to have [been] killed that night. Moses Darden lived at that time in my house upstairs. He married my daughter. Moses on the afternoon of that day came down here to Cartersville. His wife came with him. They returned from Cartersville about seven o'clock. I don't know where he went; he took the car with him immediately after he came home, sometime around seven o'clock or a little after seven o'clock, sometime about that. I never seen Moses any more until the next morning. I heard of Moses next, it was somewhere about nine or ten o'clock; he was at our door. He was at the door leading into our bedroom. I was awakened by a conversation. He and my wife were talking, I suppose he was talking to all of us. I woke up while they were talking. It was about ten o'clock. I didn't get up. He had some trouble down the road with a man; he said a fellow drawed a gun on him, and

believed he would go back and kill him. He left. · The next thing I heard of him it was about, to the best of my recollection, it was about ten o'clock. That is when he was there and said he was going to go back and kill him. He come back to my house that night. Next time he come back it was, I just don't remember hardly, I don't remember that. About one o'clock. I just don't know what he said then; this is a very unpleasant thing for me. He said that he had killed the man."

Mrs. M. L. Craddock, for the State, testified: "My daughter married Moses Darden. I live at Kingston. At the time that Chesley Davis was killed Moses Darden and his wife were living upstairs at my house. On the day that the killing occurred that night, they had been to Cartersville, he and his wife. When they returned from Cartersville it was, I imagine, seven o'clock. I didn't look at the time, but I imagine it was that time. After they returned from Cartersville about seven o'clock he left the house and went somewheres. He said he was going to have his car fixed, and left the house in the car. That was sometime around seven o'clock; it might have been seven thirty by that time. He returned to the house that night. He came back there about ten o'clock, I didn't see him at all; the room was dark was why I didn't see him, but I heard him. I went to my room door. He talked with me a little bit. That was Moses I was talking to. He said that he had trouble with a man down the road, and that he was going back and kill him. Mr. Craddock was there. I talked with him, Frank didn't; if he did, I don't remember whether he was awake then, but he didn't say anything then I don't think. I asked him who it was, and he said he didn't know, and I says don't you know who it is? because I was anxious of course, and he said he didn't know, and I didn't say any more— left the room then. I just can't tell you whether he went upstairs or not, because I was so nervous I don't know what took place about that time. He left the house then. I heard the car going away. It was sometime after he had gone that I got up and made a light and looked at my watch, and it was just about ten o'clock, maybe a little past. That was after he was gone; he left before I made a light. He came back about two o'clock. I talked with him. He said he had killed a man, and he was sorry. He said he had killed a man, and said a right smart why

he had to do it, I don't remeber just exactly. That was around two o'clock. Right about two o'clock maybe. He left again. He said he was going to call the sheriff, and he left my house then. It was about three when next he come back; he wasn't gone much over an hour. And when he came back about three his sister came with him. Miss Leila Darden. I just naturally thought he was under the influence of liquor. If he hadn't been he would have been good and kind; he was mighty good and is still good; he was as nice as he could be. You know how people will do, they will just not do right by him saying that and going away somewhere else; well, naturally I thought that. Moses or neither one of the boys told me after they came back to Kingston from the scene of the killing. Neither one of them told me that they knew that the man was dead, because after the shooting they drove on a piece beyond the car and then turned around and came back by the car. They didn't talk that with me, they didn't tell me that. I didn't see any of the rest of them that night or the next morning either, that I remember. When Moses came back with his sister about three o'clock, I wouldn't say whether or not he went to bed, but he got quiet, and I suppose he did. He didn't leave any more until after daylight. I know he didn't."

All three of the accused named in the indictment were sworn and gave testimony. Marcellus Darden, testified as follows: "On the afternoon of this trouble everybody started out in the country to get a farm hand, and we got about a mile or two beyond. We got about two miles beyond Kingston, went out the highway, the Rome pike, and turned to the right and went on over there in the negro settlement. That is known as the Gordon settlement; there are many negro families of negroes over there. That is sort of a negro community there. That is the community where D. Wilbanks lives. I say we were going out there to see about getting some farm help. We had gone over a hill, and just as we got there we met a car; it was parked on the side of the road; it had the road blocked, and the lights switched off, and as we came up the lights switched on, and we got up tolerably close, about ten or twelve feet, and I stopped and asked him to move his car, and he said, 'Damn it, I will move,' but says, 'Don't you move. I have got the drop on you,' and he pulled his car up right even with us and stopped about even with us, and Moses he stepped out on the

right-hand side of the car as the car was pulling up there. Mr. Davis had the pistol in his hand. He says, 'Damn it, don't you move, or I'll shoot you,' and Moses stepped up behind the rear of the car sorter, and he pulled just a little past, and Moses shot him. I did not know whether he was threatening me or Moses. I was driving the car. After he drew the gun and threatened to shoot us I expected Moses intended to shoot. One of them said, 'Boys, I believe it is a hold-up.' I don't know which one said that. I made one trip out there that night. When I went out there it was something like nine o'clock. After the shooting occurred, Moses got in the car and we went out by the Jones place and come into the Rome pike just this side of the county line, and come on back to Mr. Branson's. There were two in the Davis car. I did not know who it was. I did not know Mr. Davis. I had never seen him before, never heard of him before. Neither one of us three were drunk on this occasion. I did not see any weapon in Davis's car except the pistol that Davis had. I was excited under the circumstances. I went to Mr. Branson's that night after the shooting occurred, and Mr. Moore's. The purpose of going there I wanted to see Mr. Branson; he had been a friend of ours. I wanted his counsel and advice in that trouble. I had known Mr. Branson all my life; he had been a good friend of ours, and I went and told him of the trouble, and also Mr. Moore. We left Mr. Moore's and went to Moses' house, and Moses got out and stayed in there a few minutes, and later I went on down to Bud Hester's. I wanted Bud Hester to go with me down town, to get a car. Bud Hester is a negro. He is an old negro. I am well acquainted with him; he has worked for us. I wanted him to go to town with me to try to get a car and go out to see if the car was still there, or whether the man. I wanted to go and investigate the circumstances of the shooting out there. I went to Mr. Rampley's, Joe Rampley. He said that he wouldn't go, that he wouldn't leave his wife. The reason I wouldn't go, Mr. Rampley said that he wouldn't go. The reason that we didn't go in our car, it wasn't in condition to run. We like to not got it home. I reported this matter to the sheriff, five thirty or six o'clock the next morning. Why I didn't report it earlier was, I went out to Mr. Rampley's during the time, I went out there and stayed until daylight. When I ceased making an effort to get a car and go out and investigate

the matter it was about two or three o'clock. I don't remember whether it was at our house or his house. I don't know where Mose got his gun that night. I first saw Moses' gun in the car. When I got in the car down there in Kingston after eight o'clock, as I testified. Moses had the car that day. We owned it together, me and Moses. He was in the car when he came down there, and he and I decided to go out and see about the hand. Moses drove the car out of town. I took it at McMakin's; we stopped there to answer a call of nature. We did not go out that night and get any liquor from Wilbanks. I heard his testimony in reference to that. It did not happen. In going from the scene of the shooting we did go by Wilbanks' home. Why, it was a little over a half a mile, I reckon, from his house. We went immediately after the shot was fired. I didn't want to come back that way. I didn't want to come back by the car. I saw there was a man there, and I didn't know. I did not know what they were doing. I thought that Moses hit somebody when he shot."

■ This evidence was sufficient to authorize the conviction of Marcellus Darden of the offense of murder.

■ Ground 1 of the amendment to the motion for new trial assigns error because the court charged the jury, on the subject of voluntary manslaughter as follows: "I give you in charge, gentlemen, the definition of voluntary manslaughter. Manslaughter is the unlawful killing of a human creature, without malice, either express or implied, and without any mixture of deliberation whatever, which may be voluntary upon a sudden heat of passion. In all cases of voluntary manslaughter, there must be some actual assault upon the person killing, or an attempt by the person killed to commit a serious personal injury upon the person killing, or other equivalent circumstances to justify the excitement of passion, and to exclude all idea of deliberation and malice, either express or implied. I give you in charge, gentlemen, section 74 of the Penal Code of this State: 'Parents and children may mutually protect each other and justify the defense of the person or reputation of each other.' This section should be kept in mind in construing the definition of voluntary manslaughter, and in construing the rest of the charge which I shall give you. In all cases of voluntary manslaughter, there must be some actual assault upon the person killing, or his brother, as would be the truth in this

case, or an attempt by the person killed to commit a serious personal injury upon the person doing the killing, or his brother, as the facts might justify, or other equivalent circumstances to justify the excitement of passion and to exclude all idea of deliberation or malice, either express or implied. I charge you, gentlemen, that provocation by words, by threats, by menaces, or contemptuous gestures, shall in no case be sufficient to free the person killing from the guilt and crime of murder. The killing must be the result of that sudden, violent impulse of passion supposed to be irresistible; for if there should have been an interval between the assault or provocation given and the homicide, of which the jury in all cases shall be the judges, sufficient for the voice of reason and humanity to be heard, the killing shall be attributable to deliberate revenge, and shall be punished as murder." It is contended that voluntary manslaughter, in so far as this defendant is concerned, was not involved under the evidence, "it being conceded that this defendant did not fire the shot that killed Chesley Davis, the deceased, and the whole contention of the State being that the defendant conspired with Moses Darden to kill the deceased." It is further insisted that voluntary manslaughter was wholly inconsistent with the theory of a conspiracy or agreement to commit the offense of killing the deceased; and that the court should have charged that if the killing of Davis by Moses Darden was done under such circumstances that the killing would be voluntary manslaughter on the part of Moses Darden, then the jury should acquit Marcellus Darden, as there could not be any conspiracy to commit the offense of voluntary manslaughter. It is also insisted that the court erred in giving, in connection with the charge of voluntary manslaughter the instruction relative to section 74 of the Penal Code. These contentions are without merit, and we do not see how it could have hurt the defendant even if it was erroneous to give in charge the instructions excepted to. The defendant was not convicted of voluntary manslaughter, but of murder. The theory of the defense was that the shooting was the result of the threatening attitude of the deceased at the time of the homicide; that the defendant was guilty either of murder or of nothing. See Ferguson v. State, 149 Ala. 25. Under the evidence the defendant would be entitled to a charge on the subject of voluntary manslaughter; and if so, there is no error in the court giving such a charge.

■ Ground 2 assigns error because the court failed to charge the jury as follows: "In passing on the question as to whether Moses Darden was justified in shooting the deceased, if he did shoot and kill him, you may take into consideration any words, threats, and menaces that may have been used by the deceased, if any were used by him, either towards Moses Darden or his brother, and see whether those threats, menaces, and words were sufficient to create within the mind of Moses Darden that reasonable fear that either his brother or himself was in imminent danger of death or of serious bodily harm amounting to a felony; and if you find this to be true, and that Moses Darden so shot the deceased under the influence of such fears, the defendant would not be guilty, under this indictment, of any offense." Movant insists that this charge was demanded by the evidence; and that the court charged that words, threats, menaces, and contemptuous gestures would in no case be sufficient to free the person killing from the guilt and crime of murder, without qualification of any kind, and left the jury under the impression that, no matter what words, threats, or menaces the deceased used, they would not amount to any defense to the person killing. In *Price* v. *State,* 137 *Ga.* 71, this court held: "The statute defining voluntary manslaughter contains the declaration that 'provocation by words, threats, menaces, or contemptuous gestures shall in no case be sufficient to free the person killing from the guilt and crime of murder. The reading by the court of the entire code section definitive of voluntary manslaughter (Penal Code, § 65), containing the quoted language, while charging on the subject of voluntary manslaughter, is not subject to the criticism that by so doing the court entrenched upon the law of justifiable homicide, in that the reading of the section tended to convey to the jury the impression that they could not consider threats, accompanied by menaces, as defined in *Cumming* v. *State,* 99 *Ga.* 662, as sufficient cause to arouse the fears of a reasonable man that his life is in danger, or that a felony is about to be perpetrated upon him." And see, to the same effect, *Futch* v. *State,* 137 *Ga.* 75. The instruction insisted on was not complete, and left out the words, "and not in a spirit of revenge." The court did not err in failing so to charge.

■ The next two grounds are as follows: "3. Because the court failed to charge the jury as follows: 'The mere presence

alone of the defendant at the scene of the alleged crime would not be sufficient to establish his guilt of such crime, but the burden would be upon the State to show by evidence, and beyond a reasonable doubt, that his presence was for the purpose of aiding and abetting the person doing the killing.' 4. Because, while the court charged the jury a part of section 70 of the code, as follows: 'Justifiable homicide is the killing of a human being in self-defense, or in defense of property, or person, or brother, against one who manifestly intends by violence or surprise to commit a felony on either,' he erred in that he did not make application of that law to the contention of the defendant or facts of this case. Movant contends that the jury should have been instructed fully upon the defendant's theory of the case; that is, that Davis had drawn a deadly weapon on the Darden brothers, and that Moses Darden then and there fired under the belief that Davis was going to shoot, and that if Moses in shooting Davis then and there acted under either a sudden violent impulse of passion caused by Davis drawing the pistol, or under the fears of a reasonable man that either he or his brother was in danger of a serious bodily injury, or that a felony was about to be committed upon either by Davis, then the defendant on trial would be not guilty." The court charged the jury on the subject of justifiable homicide and conspiracy, and what was necessary to convict in such cases; and no timely request having been presented in writing for a fuller and more comprehensive charge on the subject, the omission to charge as stated was not cause for new trial.

█ The fifth ground complains that the court erred in admitting testimony as to possession of home brew by the witness at the time specified. The objection to this evidence, as first stated, failed to show upon what ground the objection was based. Then followed a lengthy cross-examination, at the end of which counsel said to the court: "First of all, I want to exclude from the record any evidence about this witness having, at some time in July, had some home brew and a pint of liquor about his place of business. I don't think it is material or relevant to the issue here; if they could show it was when he was with Mr. Marcellus Darden, of course it would be relevant." To which the judge responded: "I believe I will let it in, Mr. Whitaker." This was the ruling of the court, and to this ruling no specific exception is taken.

■ Ground 6 complains because of the following occurrence upon the trial: "The solicitor-general was making the opening argument to the jury for the State. Moses Darden, a brother of and witness for defendant Marcellus Darden, was seated to one side of the court-room. As long as the jury was attentive to the speaker, they would not see Moses Darden. The sheriff came in a side door of the court-room and asked Moses to get ready to go back to Rome, Georgia, where he was confined in jail. This request by the sheriff was made in a whisper, and attracted the attention of none except those seated beside and behind Moses Darden. When Moses rose to leave the court-room, his wife, two sisters, two brothers, and one or two friends, including sheriff Gaddis, quietly shook his hand and whispered good-bye. Apparently no one was attracted by their acts, except those seated in the seats immediately beside and behind Moses. No person spoke out loud to Moses Darden. The solicitor-general continued to hold the attention of and address the jury. Moses Darden was within three feet of the door leading out of the court-room, and a deputy sheriff was with him. Suddenly in a loud voice the judge called to Moses Darden and his relatives to stop that hand-shaking, told them to sit down or get out of the court-room, and said their conduct was improper conduct before the jury, and accused them of purposely staging an exhibition. This act of the judge stopped the solicitor's argument, and called the attention of every one in the court-room to the little group in the corner of the room. The jury had apparently not before this time noticed them, and doubtless would not have noticed the occurrence except for the fact that their attention was called to it by the conduct of the court in bringing it to their attention. Counsel for the defendant was seated with the defendant and his relatives and friends attracted by the argument of the solicitor-general, and was not attracted by the occurrence of which the court complained, and was surprised by the remarks of the court, and wondered what provoked his conduct. Not at the time knowing what had happened, counsel for defendant then made no motion for a mistrial; but when counsel assisting in the prosecution of the case, in the concluding argument to the jury, referred to the matter substantially as follows: 'You saw the defendant and his relatives stage that performance over there a while ago for effect upon this jury,' coun-

sel for defendant then interrupted and insisted that such a statement by counsel in the concluding argument was improper and unwarranted, and asked the court to stop it and instruct the jury not to consider it. Upon failure of the court to grant the request, and a substantial repetition by counsel concluding the argument, counsel for defendant made a motion for the court to declare a mistrial, which motion was refused. Movant contends that both the conduct of the court and also that of counsel for the prosecution was highly improper and prejudicial to movant's cause, and error upon which a new trial should be granted." In connection with this ground the judge appended a note as follows: "Mose Darden, a brother and witness for the defendant, was about to be carried back to Rome where he was in jail. The solicitor-general was then addressing the jury in the Marcellus Darden case. A sister and the defendant and another brother of Mose Darden, and some friends, and the sheriff of Bartow County were telling Mose Darden good-bye and shaking hands with him in the court-room in plain view of the jury trying Marcellus Darden; a sister of Mose Darden was kissing and hugging him; a sister and one brother were crying. This went on for a minute or two. The minds of the jurors were taken from the remarks of the solicitor-general and placed upon what was going on between Mose Darden, his relatives and friends, as described. The court observed these things and spoke to the sheriff, Mose Darden, and the rest that were so engaged, and told them that a demonstration like that was improper in the presence of the jury and must cease; and that if friends desired to tell Mr. Darden good-bye, let it be done outside the court-room. With reference to what was said by J. M. Neel Jr., in concluding argument for the State, the court recalls it to wit: Mr. Neel was telling the jury that a verdict of guilty of murder ought to be rendered in the case on the law and on the evidence, and that sympathy has no place in the finding of a true verdict. He told the jury that frequently demonstrations were staged on the trial of cases in the court-room, and that the one which the court had previously stopped might have been staged to get the sympathy of the jury. He said that sympathy for the living or the dead has no place in this trial. When Mr. Neel spoke to the jury as above stated, Mr. J. R. Whitaker moved the court to declare a mistrial, which was not done. The motion was

made some three hours after the court spoke as first above stated. The above is the recollection of the court as, in substance, what happened as complained against." In view of the note of the presiding judge this ground will not cause a reversal.

■ Ground 7 complains that the evidence was not sufficient to show a conspiracy and did not make out a case of conspiracy against this defendant. We are of the opinion that the evidence was sufficient to authorize the jury to find that a conspiracy existed between the three defendants to take the life of the deceased.

The court did not err in overruling the motion for new trial.

*Judgment affirmed. All the Justices concur, except Russell, C. J., who dissents.*